**NOT FOR PUBLICATION**

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

|  |  |  |
|---|---|---|
| SHAMSIDDIN A. ABDUR-RAHEEM, | : | |
| | : | Civil Action No. 15-1743 (MAS) (TJB) |
| Plaintiff, | : | |
| | : | |
| v. | : | **OPINION** |
| | : | |
| NEW JERSEY DEPARTMENT OF CORRECTIONS, et al., | : | |
| | : | |
| Defendants. | : | |

**SHIPP, District Judge**

*Pro se* Plaintiff Shamsiddin A. Abdur-Raheem, confined at New Jersey State Prison ("NJSP") in Trenton, New Jersey, filed the instant Complaint pursuant to 42 U.S.C. § 1983, alleging various violations of his constitutional rights and other related state law claims. Presently before the Court is Defendants' Motion to Dismiss ("Motion"). (Defs.' Moving Br., ECF No. 24-2.) Plaintiff filed opposition to the Motion (Pl.'s Opp'n Br., ECF No. 32), Defendants filed a reply (ECF No. 37), and Plaintiff filed a Surreply[1] (ECF No. 57-3). For the reasons stated below, the Court grants the Motion in part, and denies it in part.

## I.   FACTUAL BACKGROUND[2]

The Complaint raises a number of claims arising from multiple distinct incidents and issues, as set forth below.

---

[1] On December 29, 2016, the Court granted Plaintiff leave to file a Surreply. (ECF No. 58.)

[2] For the purposes of this Opinion, the Court accepts all facts alleged in the Complaint as true, and views the facts in the light most favorable to Plaintiff. *See James v. City of Wilkes-Barre*, 700 F.3d 675, 679 (3d Cir. 2012).

### A.    The Assault Incidents[3]

Plaintiff alleges that he was verbally and physically assaulted by unknown defendants on November 8, 2012.  (Compl. 13, ECF No. 1.)  Specifically, Plaintiff alleges that he was "threatened, harassed, sexually harassed, assaulted, and subject[ed] to racially charged slurs by [New Jersey Department of Corrections ("NJDOC")] correctional officers." (*Id.*)  Furthermore, Plaintiff alleges that he was "punched in the head and body, slapped in the head, shoved headfirst into a wall, having his head banged into a wall, and thrown across the room by various officers at [the Central Reception and Assignment Facility ("CRAF")], resulting in conscious pain and injury of [P]laintiff." (*Id.*)  Plaintiff further alleges that between November 2012 and January 2013, "[he] was subject to harassment, threats, and assaults by NJDOC Special Operations Officers . . . during various cell searches within his cell."[4] (Pl.'s Opp'n Br. 85.)  Plaintiff additionally alleges that he was:

> hit in the head, and shoved and pushed around by various NJDOC
> . . . Officers resulting in conscious pain.  All of the dates on which
> the alleged harassment, threats, and assaults took place are not
> presently recalled by [P]laintiff, albeit [P]laintiff does recall the
> specific date of December 12, 2012 or December 17, 2012.

(*Id.* at 86.)

### B.    Protective Custody Incident

Plaintiff alleges that he was placed in Involuntary Protective Custody ("IPC") within the first weeks of entering NJSP. (*Id.*)  Plaintiff further alleges that he was not given any hearings to

---

[3] The Court cites to the ECF page numbers of the Complaint.

[4] From the page numbering of the Complaint, it appears that Plaintiff may have inadvertently omitted two pages from the Complaint. (Compare Compl. at 14 with Compl. at 15.)  Indeed, Plaintiff attached these two missing pages to his opposition brief. (*See* Pl.'s Opp'n Br. 85, 86.)

challenge or otherwise contest his placement in IPC until August 29, 2014, which resulted in "approximately [two] years without any adjudication hearing in violation of state and federal law, and his constitutional rights." (*Id.*) In addition, Plaintiff alleges that he was not notified of the August 29, 2014 protective custody hearing until August 18, 2014, and that the notice he received did not include a statement containing the bases for the hearing. (Compl. 15.) Plaintiff alleges that after the August 29, 2014 hearing, he was denied removal from IPC "due to the 'heinous nature' and 'notoriety' of the case leading to [P]laintiff's convictions . . . [but] Plaintiff has not been shown any facts of [sic] evidence nor any alleged threat(s) against [P]laintiff used to justify his placement on IPC." (*Id.*) Plaintiff further alleges that he remained on IPC status "unjustly without any concrete facts to support his placement on same." (*Id.*)

Additionally, Plaintiff alleges that he submitted numerous requests for placement in the general population, or placement on IPC "congregant" status. (*Id.*) Plaintiff further alleges that while in IPC, he was not permitted to eat meals in congregation, participate in outside recreation in congregation, have regular housing unit jobs, and have various institutional, social, educational, and religious programs and services in congregation. (*Id.* at 16.)[5] Plaintiff also alleges that, while in IPC, he was only allowed non-contact window visits. (*Id.*)

### C.     Cellphone Rule

The Cellphone Rule issue was the subject of the Court's May 31, 2016 Order ("Prior Order"). (*See* Order, May 31, 2016, ECF No. 38.) In the Prior Order, the Court construed Plaintiff's claim as challenging the constitutionality of "a rule promulgated by the [NJDOC] that prohibits phone calls from inmates to cellphones regardless of who owns the cellphones, even if

---

[5] The Court notes that Plaintiff does not allege that he was denied actual meals, recreational activities, or religious activities, but that he was not able to do so in congregation, *i.e.* with other people, due to his IPC status.

they belong to family members ('Cellphone Rule')." (*Id.* at 1.) Plaintiff asserts that the Cellphone Rule is "prejudicial and discriminates against inmates under NJDOC authority, as well as against their families, loved ones, friends, and whomever else they desire to associate with via calling them on th[eir] cell-phone." (Compl. 17.) Plaintiff alleges that the Cellphone Rule "is unconstitutional and in violation of inmates' Freedom of Speech rights under [the Constitution]." (*Id.*)

### D.   Toilet Incident

Plaintiff alleges that there are significant sanitation problems at NJSP. (*Id.* at 19.) Specifically, Plaintiff alleges issues related to the "ping-pong toilets" and the proper disposal of waste from the toilets into the sewage system. (*Id.*) As a result of the alleged sanitation issues, Plaintiff contends that he:

> was forced to inhale the toxic effluvium of his neighbor's waste
> many times. And many times after plaintiff's neighbor's waste
> entered plaintiff's toilet he used the bathroom and water from
> plaintiff's toilet bowl contaminated with his neighbor's waste has
> splashed upon his posterior and [sic] canal.

(*Id.*) Plaintiff further alleges that "[t]his sanitation problem can lead to the transfer of many diseases and viruses by the bacteria, toxic waste and effluvium contaminating one's neighbor's toilet. This problem has also led [sic] to many confrontations, arguments, and mutual hostility and frustration between neighbors." (*Id.*)

### E.   Lack of Legal Assistance

Plaintiff alleges that while in IPC, he was "completely barred from accessing the institutional law library and from requesting and receiving assistance from civilian paralegals." (*Id.*) Plaintiff further alleges that he was "forced to depend on and receive legal assistance from convicted prisoner paralegals who are often bias[ed], untrustworthy, negligent, unconcerned,

4

treacherous, on drugs, and otherwise at odds with other inmates and unconcerned with actually ensuring [other inmates] receive adequate legal assistance[.]" (*Id.* at 20.) Plaintiff also alleges that "their assistance is more than often inadequate and ineffective while they are inept, untrustworthy, and unfit as paralegals."[6] (*Id.*)

### F.   Fabricated Disciplinary Proceedings

Plaintiff alleges that on April 14, 2014, Defendant Corey Forbes ("Forbes"), a correctional officer, entered his cell to conduct a cell search, and confiscated a legal document ("Document") containing a "basic 'diagram' of the 'trial courtroom' in which plaintiff attended trial and the immediate annexations thereto, which is needed as a visual guide in current litigation he is a party of [sic] to illustrate an incident that took place within the courtroom." (*Id.* at 21.) Plaintiff further alleges he explained to Forbes that it was a legal document, but Forbes informed him that his shift supervisor would have to be alerted to determine whether Plaintiff would be permitted to keep the Document. (*Id.* at 21-22.) Upon checking with the shift supervisor, who allegedly determined that Plaintiff was permitted to keep the Document, Forbes returned the Document to Plaintiff. (*Id.* at 22.)

Plaintiff alleges that later that afternoon, however, Defendant Donald Kilpatrick ("Kilpatrick"), another correctional officer, came to his cell and demanded to see the Document. (*Id.*) When Plaintiff handed him the Document, Kilpatrick confiscated it. (*Id.*) About half an hour later, Kilpatrick returned with Defendant Daniel Burns ("Burns"), the unit sergeant, and another officer to conduct a cell search. (*Id.* at 22-23.) Burns asked Plaintiff about the Document, and Plaintiff again explained that it was a legal document, and that it was a visual aid in an ongoing

---

[6] The Court notes that Plaintiff does not allege that the lack of legal assistance has resulted in the denial, dismissal, or loss of any of his legal claims in any legal suit. In addition, the Complaint does not contain any allegations regarding the specific legal assistance Plaintiff required.

litigation. (*Id.* at 23.) Plaintiff alleges that the cell search revealed no item of significance, and the officers left promptly without confiscating any other document. (*Id.*) Later, when Plaintiff asked Kilpatrick when the Document would be returned to him, Kilpatrick informed him that it had been given to the Special Investigations Division ("SID") and that he could expect to be disciplined because the Document had been deemed contraband. (*Id.* at 23-24.)

The next day, Plaintiff was served with a disciplinary report, in which Kilpatrick allegedly stated that he found "a hand drawn map of Middlesex County Superior Court Room 501," which presumably was deemed contraband. (*Id.* at 24.) Plaintiff alleges that Kilpatrick's statement was inaccurate, because (a) Kilpatrick did not "find" the Document in Plaintiff's cell; rather Plaintiff "gave" it to him; and (b) the Document was not a "map"; rather it was a "diagram." (*Id.*) Plaintiff alleges that Kilpatrick "vindictively pursued a false charge" even though he knew that Forbes's unit supervisor had already authorized Plaintiff to keep the Document. (*Id.*)

Regarding the subsequent disciplinary action, Plaintiff alleges that he never received a hearing or a report of adjudication. (*Id.* at 25.) Plaintiff further alleges that he was only able to obtain a copy of the report after he made a request under New Jersey's Open Public Records Act ("OPRA"). (*Id.*) Plaintiff alleges that the report falsely stated that he had a hearing on April 17, 2014. (*Id.*) Plaintiff alleges that this disciplinary action resulted in an extension of his IPC status and made him ineligible to participate in an incentive food package program at the prison. Plaintiff further alleges that he filed numerous grievances regarding this incident, but the prison administrators "biasly [sic] and intentionally overlooked the misconduct when responding to [P]laintiff's grievances in [an] attempt to cover up the misconduct of NJDOC staff." (*Id.* at 26.) Moreover, Plaintiff alleges that during his appeal of the disciplinary action, he requested numerous video logs and footage, but never received them. (*Id.* at 26-27.) Plaintiff also alleges that he was

6

retaliated against by Kilpatrick and other officers for having filed an appeal, in which he alleges
that the officers discarded many of his grievance forms, subjected him to targeted cell searches,
denied him showers, and tampered with his incoming mail. (*Id.* at 27-28.)

### G.   OPRA Requests

Plaintiff alleges that he filed requests, pursuant to OPRA, for records related to his
disciplinary proceedings from Defendant John Falvey ("Falvey"), Records Custodian for NJDOC.
(*Id.* at 29-30.) He further alleges that Falvey denied all of his requests in violation of OPRA. (*Id.*
at 30.)

### H.   Detention Incident

Plaintiff alleges that on August 30, 2014, he was falsely charged by Forbes for an
infraction, asserting that Forbes intentionally planted contraband in his cell and, as a result,
Plaintiff was placed in detention. (*Id.* at 30.) As result of this false charge, Plaintiff alleges that
he was denied "state-pay," compelled to send some of his personal property home, which he was
no longer allowed to possess, and was no longer allowed to purchase electronic appliances on
commissary. (*Id.* at 34.) Plaintiff further alleges that he did not receive a disciplinary hearing
regarding this incident until February 2015, which was six months after the incident and after he
had already served his detention. (*Id.*) Plaintiff also alleges that he received "inadequate assistance
from counsel substitute" and that his numerous requests for evidence were denied, including
"polygraph examination, handwriting analysis of handwritten note alleged to [have] been found,
chain-of-custody reports of evidence, records of documented cell searches, video surveillance,
fingerprint and DNA analysis of evidence[.]" (*Id.*) Plaintiff further alleges that he did not receive
a fair and impartial hearing. (*Id.*)

Plaintiff also complains about his conditions of confinement while in detention.  Plaintiff alleges that for four days, he was "forced to live and sleep within [his] cell . . . without any blankets and only one sheet, that was given to him by another inmate, on a bare mattress, despites [sic] his requests for bedding materials." (*Id.* at 30.)  Plaintiff further alleges that he was held for "approximately 55 calendar days straight" in violation of New Jersey law and "common standards." (*Id.*)  Plaintiff also alleges that he was deprived of all of his personal property while in detention, "including legal materials, reading and writing materials, basic hyg[i]enic supplies, and clothing," and as a result, he was "hindered" in his ongoing legal proceedings.[7] (*Id.* at 31.) Plaintiff additionally alleges that he was denied recreation, "regular" use of the phone, and "regular" visits. (*Id.*)  Plaintiff admits that some items of his personal property were returned to him after detention, although he was forced to "send some of his property home as a sanction." (*Id.*)  Regardless, Plaintiff alleges that many of his personal items were missing,[8] and in fact were left out of the inventory form that Forbes submitted when Forbes placed him in detention. (*Id.* at 32.)

## I.   Plaintiff's Claims

Based on the foregoing incidents, Plaintiff raises twelve grounds for relief:  (1) due process violations stemming from (a) the Protective Custody Incidents, (b) the Fabricated Disciplinary Proceedings; and (c) the Detention Incident; (2) First Amendment freedom of speech violations

---

[7] The Court notes that Plaintiff does not allege that any of his legal claims have been denied or dismissed due to this alleged deprivation.

[8] The missing items, as alleged, were "Andis Beard Trimmers purchased for $43.45; 7 stamps costing $3.43; 1 pack of typing paper purchased for $6.31; 1 bottle of glue purchased for $3.00; 1 box of paperclips purchased for $2.00; Georgetown Law Journal-Annual Review of Criminal Procedures, 41st Ed., purchased for $25.00; Prisoner's Self-Help Litigation Manual priced at $39.95; 3X grey sweatpants; 3X grey shorts; 1 pair of white shoelaces; and two buttons . . . from my Brother Word Processor, WP-5900MDS--the Return-key and brackets-key." (Compl. 32.)

stemming from the Cellphone Rule; (3) state-law negligence claims stemming from all of the above incidents; (4) state-law gross negligence claims; (5) state-law assault and battery claims stemming from the Assault Incidents; (6) cruel and unusual punishment in violation of the Eighth Amendment; (7) state-law OPRA violations; (8) deliberate indifference; (9) denial of legal access; (10) state-law intentional infliction of emotional distress; (11) property claims regarding his missing personal property; and (12) violations of his right to petition the government.

For relief, Plaintiff demands: (1) a declaration that Defendants violated Plaintiff's federal and state rights; (2) compensatory damages; (3) punitive damages; (4) costs and fees; and (5) injunctive relief, in the forms of:   (a) return of the Document, (b) expungement of his disciplinary charges; (c) release from IPC; (d) an order directing Defendants to allow him to have contact visits while in IPC; (e) an order directing Defendants to provide him with civilian paralegals and "an e-law library on a lap-top or tablet or other e-device that shall be updated regularly with all current law"; (f) an order directing Defendants to abolish the current system that compels inmates to submit requests for legal assistance; (g) an order directing Defendants to fix the prison toilet problems; (h) an order directing Defendants to install video cameras throughout the prison so that any inappropriate actions by correctional officers will be recorded; (i) an order directing the state to require all correctional officers to wear body cameras; (j) an order directing Defendants to install "dip-bars and pull-up bars within recreational areas"; (k) an order mandating changes to the prison grievance system; (l) an order repealing the Cellphone Rule; (m) an order directing Defendants to comply with his OPRA requests; and (n) an order limiting the maximum time for detentions.[9]  (*Id.* at 59-64.)

_____

[9] Because the Court previously denied Plaintiff's request for class certification, *see infra*, the Court construes all of Plaintiff's claims and requests for relief as applied to him as an individual only.

## II.    PROCEDURAL HISTORY

Plaintiff's Complaint was filed on March 10, 2015. Plaintiff originally asserted both individual claims and class claims, alleging that similarly situated prisoners have all experienced the violations that Plaintiff allegedly experienced. (*See, e.g.*, Compl. 52.) The Court granted Plaintiff in forma pauperis status and, upon screening, denied class certification, dismissed Defendant NJDOC on immunity grounds, and allowed Plaintiff's individual claims to proceed. (Op. & Order, Apr. 30, 2015, ECF Nos. 5, 6.) Plaintiff then filed a motion for reconsideration of the class certification denial, (Mot. for Recons., ECF No. 9), and voluntarily dismissed his claims against Defendants Mervin Ganesh and Kale Mabey, (*see* Notice of Voluntary Dismissal, ECF No. 12). The remaining Defendants filed the instant Motion on October 20, 2015. The Court denied the motion for reconsideration on December 16, 2015. (Op. & Order, Dec. 16, 2015, ECF Nos. 28, 29.)

On May 31, 2016, after the Motion was fully briefed, the Court ordered the parties to file supplemental briefing on Plaintiff's Cellphone Rule claim, finding that the constitutionality of the rule warranted reexamination in light of the prevalent use of cellphones in modern-day society. (Prior Order 4.) The Court also appointed Plaintiff pro bono counsel to assist Plaintiff and the Court in adjudicating this claim. (*Id.*) After supplemental briefs were filed, the Court held oral argument on the claim, at which time the Court reserved decision on the issue. (*See* ECF No. 50.) The instant Opinion follows.[10]

---

[10] Unfortunately, due to unforeseen circumstances, Plaintiff's pro bono counsel had to withdraw from the case, (*see* Order Granting Withdraw, ECF No. 52), but not before he had fully briefed, and attended the oral argument regarding the Cellphone Rule claim.

## III.   STANDARD OF REVIEW

Every complaint must comply with the pleading requirements of the Federal Rules of Civil Procedure.  Rule 8(a)(2) requires that a complaint contain "a short and plain statement of the claim showing that the pleader is entitled to relief."  "Specific facts are not necessary; the statement need only 'give the defendant fair notice of what the . . . claim is and the grounds upon which it rests.'" *Erickson v. Pardus*, 551 U.S. 89, 93 (2007) (citations omitted).

> While a complaint . . . does not need detailed factual allegations, a plaintiff's obligation to provide the "grounds" of his "entitle[ment] to relief" requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do . . . . Factual allegations must be enough to raise a right to relief above the speculative level[.]

*Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (citations omitted); *see Connelly v. Lane Constr. Corp.*, 809 F.3d 780, 786 (3d Cir. 2016) (precedential).  On a motion to dismiss for failure to state a claim brought pursuant to Federal Rule of Civil Procedure 12(b)(6), a "defendant bears the burden of showing that no claim has been presented." *Hedges v. United States*, 404 F.3d 744, 750 (3d Cir. 2005).  In determining the sufficiency of a pro se complaint, the Court must be mindful to accept its factual allegations as true and to construe it liberally in favor of the plaintiff.  *See James v. City of Wilkes-Barre*, 700 F.3d 675, 679 (3d Cir. 2012); *Haines v. Kerner*, 404 U.S. 519, 520-21 (1972); *United States v. Day*, 969 F.2d 39, 42 (3d Cir. 1992).

## IV.   DISCUSSION

### A.   The Assault Incidents

Defendants argue that Plaintiff's claims arising out of the Assault Incidents are time-barred. (Defs.' Moving Br. 9-10.)  The Court agrees.  Under New Jersey law, an action for an injury caused by a wrongful act, neglect, or default must be commenced within two years of accrual of the cause of action.  N.J.S.A. § 2A:14-2; *Estate of Lagano v. Bergen Cty. Prosecutor's Office*, 769 F.3d 850,

11

859 (3d Cir. 2014). Federal courts look to state law to determine the limitations period for § 1983 actions. *Wallace v. Kato*, 549 U.S. 384, 387-88 (2007); *Lagano*, 769 F.3d at 859. Civil rights or constitutional tort claims are best characterized as personal injury actions and are governed by the applicable state's statute of limitations for personal injury actions. *Lagano*, 769 F.3d at 859. Accordingly, New Jersey's two-year limitations period on personal injury actions governs both Plaintiff's federal and state law claims. *Id.*

Here, Plaintiff alleges that the Assault Incidents all occurred "between the months of November 2012-January 2013." (Pl.'s Opp'n Br. 85.) The Complaint was filed, however, on March 10, 2015, more than two years after all of the alleged assaults had occurred. As such, it appears plainly on the face of the Complaint that Plaintiff's claims regarding the Assault Incidents are barred by the applicable statute of limitations.

Nevertheless, Plaintiff argues for equitable tolling, asserting that extraordinary circumstances caused the late filing of the Complaint. (Pl.'s Opp'n Br. 22.) Specifically, Plaintiff asserts that towards the end of his statute of limitations period, he was placed in detention by Defendants, without access to legal assistance and his legal documents, from August 30, 2014 to October 29, 2014—or about a week prior to the expiration of the statute as to his claims concerning the November 8, 2012 assault. (*Id.*) This, Plaintiff argues, caused his late filing, and Plaintiff requests the Court to grant equitable tolling and deem the entirety of Plaintiff's claims regarding the Assault Incidents as timely. The Court rejects Plaintiff's argument.

"Generally, a litigant seeking equitable tolling bears the burden of establishing two elements: (1) that he has been pursuing his rights diligently, and (2) that some extraordinary circumstances stood in his way." *Ross v. Varano*, 712 F.3d 784, 798 (3d Cir. 2013) (citations omitted). "Extraordinary circumstances permitting equitable tolling have been found where:

12

(1) the petitioner has been actively misled; (2) the petitioner has been prevented from asserting his rights in some extraordinary way; (3) the petitioner timely asserted his rights in the wrong forum, or (4) the court has misled a party regarding the steps that the party needs to take to preserve a claim." *Gibbs v. Goodwin*, No. 09-1046, 2009 WL 1307449, at *3 (D.N.J. May 1, 2009) (internal citations omitted).    Equitable tolling, however, is only warranted under extraordinary circumstances that would have *prevented* a litigant from a timely filing.    *Lozano v. Montoya Alvarez*, 134 S. Ct. 1224, 1232 (2014); *LaCava v. Kyler*, 398 F.3d 271, 276 (3d Cir. 2005).

"[F]or a [litigant] to obtain relief there must be a causal connection, or nexus, between the extraordinary circumstances he faced and [his] failure to file [on-time]." *Ross*, 712 F.3d at 803. "To secure equitable tolling, it is not enough for a party to show that he experienced extraordinary circumstances.   He must further demonstrate that those circumstances caused him to miss the original filing deadline." *Id.* at 803 n.29 (quoting *Harper v. Ercole*, 648 F.3d 132, 137 (2d Cir. 2011)).   "The word 'prevent' requires the petitioner to demonstrate a causal relationship between the extraordinary circumstances on which the claim for equitable tolling rests and the lateness of his filing, a demonstration that cannot be made if the petitioner, acting with reasonable diligence, could have filed on time notwithstanding the extraordinary circumstances." *Id.* (quoting *Valverde v. Stinson*, 224 F.3d 129, 134 (2d Cir. 2000)).

Here, the alleged extraordinary circumstance did not *prevent* Plaintiff from filing a timely complaint. To begin, the alleged extraordinary circumstance did not occur until August 30, 2014, almost 22 months after the earliest assault incident occurred.   Plaintiff does not explain why he could not have filed the Complaint during those 22 months.   Waiting until the last minute to file a complaint, and then alleging that a short delay caused by prison officials resulted in a late filing, does not justify equitable tolling. *See Lyons v. Emerick*, 187 F. App'x 219, 222 (3d Cir. 2006)

("Despite the fact that [the petitioner] had two years to file his complaint, he waited until the last minute when his schedule was derailed by a delay for the paperwork necessary to file his complaint *in forma pauperis*. [The petitioner] did not exercise reasonable diligence in pursuing his claims and, thus, is not eligible for equitable tolling."); *see also Pace v. DiGuglielmo*, 544 U.S. 408, 419 (2005) ("Had petitioner advanced his claims within a reasonable time of their availability, he would not now be facing any time problem.").

Furthermore, while claiming that the alleged extraordinary circumstance left him with only a week to make a timely filing, Plaintiff nonetheless did not file the Complaint until more than four *months* after the alleged extraordinary circumstance ended—further evidence of Plaintiff's lack of due diligence. Lastly, although he allegedly had only a week to file timely claims as to the November 8, 2012 incident, Plaintiff still had several months to file timely claims as to the other incidents that allegedly occurred as late as January 2013, yet he did not explain why those claims were not timely asserted. *See Rinaldi v. Gillis*, 248 F. App'x 371, 381 (3d Cir. 2007) (finding that equitable tolling was not warranted when the petitioner still had one-and-one-half months to make a timely filing after the alleged extraordinary circumstance ended). Accordingly, the Court finds that Plaintiff is not entitled to equitable tolling on his claims arising out of the Assault Incidents, and those claims are dismissed with prejudice as time-barred.

### B.    State Law Tort Claims

Next, Defendants argue that Plaintiff's state law tort claims—namely his claims of negligence, gross negligence, assault and battery, and intentional infliction of emotional distress—must be dismissed because Plaintiff failed to serve them with a notice of claim as required under state law. (Defs.' Moving Br. 10-13.) The Court agrees. Under the New Jersey Tort Claims Act ("NJTCA"), when asserting a state tort claim against a public entity or a public employee, a

14

plaintiff must give notice of the claim within ninety days after the cause of action has accrued. *See* N.J.S.A. § 59:8-8; *Konah v. City of Newark*, No. L-962-10, 2011 WL 1598957, at *2 (N.J. Sup. Ct. App. Div. Apr. 29, 2011); *Brown v. Twp. of Neptune*, No. 11-7162, 2014 WL 3517776, at *7 (D.N.J. July 15, 2014). This notice requirement applies to common law intentional tort claims as well as negligent conduct. *See Ptaszynski v. Uwaneme*, 371 N.J. Super. 333, 343 (App. Div. 2004) (intentional tort claims); *Velez v. City of Jersey City*, 180 N.J. 284, 292-93 (2004) (negligent conduct). The ninety-day notice period may be extended by a court upon a finding of "sufficient reasons constituting extraordinary circumstances for [the plaintiff's] failure to file notice of claim within the period of time prescribed," but only if the plaintiff files a late notice "within one year after the accrual of his claim[.]" N.J.S.A. § 59:8-9; *see Slater v. Hardin*, No. L-8574-09, 2014 WL 923337, at *5 (N.J. Sup. Ct. App. Div. Mar. 11, 2014). Plaintiffs who do not comply with this requirement are "forever barred" from recovering on their claim. *See* N.J.S.A. § 59:8-8. Notice is important because it provides state agencies the "opportunity to investigate the claims, and take disciplinary or other appropriate action to rectify inappropriate behavior or flawed practices[.]" *Mawhinney v. Francesco*, No. 08-3317, 2010 WL 2557713, at *9 (D.N.J. June 22, 2010) (quoting *Velez*, 180 N.J. at 293). Failure to file a notice of claim is a ground for dismissal at the motion to dismiss stage. *See Williams v. Westampton Police Dep't*, No. L-1144-13, 2014 WL 5393184, at *3 (N.J. Sup. Ct. App. Div. Oct. 24, 2014).

Here, Plaintiff does not deny that he failed to serve Defendants with a notice of claim under the NJTCA. Plaintiff, nevertheless, opposes dismissal. Plaintiff argues that the failure to file a notice of claim is a jurisdictional defense. Plaintiff further argues that the fact that Defendants do not specify whether they are moving under Rule 12(b)(1) or Rule 12(b)(6) prejudices him and the Court should deny dismissal on these claims. (Pl.'s Opp'n Br. 15-17.) Indeed, while Defendants

assert defenses generally under both Rule 12(b)(1) and Rule 12(b)(6), it is unclear under which standard Defendants assert this defense. (*See* Defs.' Moving Br. 12-13.)

The Third Circuit has held that it is impermissible for a district court to reach the merits of a claim through a Rule 12(b)(1) motion, which in essence would be converting a Rule 12(b)(1) motion to a Rule 12(b)(6) motion. *Davis v. Wells Fargo*, 824 F.3d 333, 348-49 (3d Cir. 2016). The Third Circuit reasoned that because in a Rule 12(b)(1) motion, the burden is on the plaintiff to establish subject matter jurisdiction, and a defendant may attack the allegations in the complaint through the submission of contrary evidence—neither of which is applicable to a Rule 12(b)(6) motion—district courts must take caution not to convert a Rule 12(b)(1) defense into that of a 12(b)(6) defense. Because Rule 12(b)(6) affords greater protection to a plaintiff, however, district courts are free to consider a jurisdictional argument through the lens of Rule 12(b)(6)—that is, if the Complaint as pled does not facially establish a court's jurisdiction, then the claim can be dismissed for failure to state a claim upon which relief may be granted. *Kehr Packages, Inc. v. Fidelcor, Inc.*, 926 F.2d 1406, 1409 (3d Cir. 1991) (finding that there is no harm in analyzing a Rule 12(b)(1) argument under the Rule 12(b)(6) standard); *see Mortensen v. First Fed. Sav. & Loan Ass'n*, 549 F.2d 884, 891 (3d Cir. 1977) ("At the outset we must emphasize a crucial distinction, often overlooked, between 12(b)(1) motions that attack the complaint on its face and 12(b)(1) motions that attack the existence of subject matter jurisdiction in fact, quite apart from any pleadings. The facial attack . . . offer[s] similar safeguards to the plaintiff [as a Rule 12(b)(6) challenge]: the court must consider the allegations of the complaint as true."); *see also* Fed. R. Civ. P. 8(a) ("A pleading that states a claim for relief must contain . . . the grounds for the court's jurisdiction[.]").

In the instant matter, the Court need not rely on any evidence outside of the pleadings to find that Plaintiff has failed to state a claim upon which relief may be granted with regard to his state law tort claims. Defendants' argument is simple: Plaintiff has failed to satisfy his affirmative burden of *pleading* the basis of this Court's jurisdiction. Indeed, there is no allegation in the Complaint that Plaintiff has filed a notice of claim under the NJTCA. Because Plaintiff claims relief under state law, he must follow established state procedures. *See Murphy v. Bloom*, 443 F. App'x 668, 670 (3d Cir. 2011) ("The District Court [] properly recognized that [the plaintiff] did not follow the proper procedure for bringing a [state law] claim . . . as required by state law."). Under state law, the filing of a notice of claim is a *jurisdictional* prerequisite before initiating suit. *Ptaszynski*, 371 N.J. Super. at 343. As such, the state court, this Court, and other courts in this district have all previously dismissed state tort law claims under the NJTCA for a plaintiff's failure to demonstrate that a notice of claim had been filed with the defendants prior to filing a lawsuit. *See Williams*, 2014 WL 5393184, at *3; *Kadonsky v. D'Ilio*, No. 14-8104, 2016 WL 3606780, at *4 (D.N.J. July 1, 2016); *see also Evans v. Gloucester Twp.*, 124 F. Supp. 3d 340, 354 (D.N.J. 2015); *Knox v. Union Twp. Bd. of Educ.*, No. 13-5875, 2015 WL 769930, at *12 (D.N.J. Feb. 23, 2015); *Roberts v. Ziolkowski*, No. 12-4763, 2013 WL 1869621, at *4 (D.N.J. May 3, 2013). Although Plaintiff argues that he should be given an opportunity to demonstrate that this Court has jurisdiction over his state law tort claims, (Pl.'s Opp'n Br. 27-28), he nevertheless makes no argument at all in his opposition that he actually filed a notice of claim as required by the NJTCA.

Plaintiff's second argument against dismissal is that "his exhaustion of administrative remedies are in substantial compliance with NJTCA's notice requirements." (*Id.* at 29.) Plaintiff cites to no authority for this proposition. Instead, Plaintiff argues that because state regulations provide him with an administrative remedy process, and because the NJTCA only requires

"substantial compliance" with the notice of claim requirement, he provided Defendants with constructive notice of his state law tort claims in this suit when he sought administrative remedies in the first instance. (*Id.* at 31.) As Plaintiff argues, "NJDOC has substantially incorporated the provisions of NJTCA's notice requirements into its remedy system available specifically for inmates incarcerated under their domain. It would be redundant and futile for an inmate to serve a tort claim upon NJDOC when one has already exhausted administrative remedies." (*Id.*)

Plaintiff's argument suffers a fatal flaw. The purpose of the notice of claim requirement under the NJTCA is to provide the defendants notice of an impending lawsuit. An inmate who has filed administrative grievances is in no way assured to file a subsequent lawsuit if and when his grievances are denied. In other words, filing a grievance does not automatically signal an impending lawsuit and, therefore, cannot serve as constructive notice that a lawsuit will be filed. Furthermore, if the Court adopts Plaintiff's rationale, state defendants would be compelled to prepare for a possible lawsuit every time an inmate files a prison grievance, on the off chance that such grievance results in a lawsuit in the future. Moreover, Plaintiff's argument has already been foreclosed by the state court. *See Haymes v. Timmerman*, No. L-0910-13, 2015 WL 998676, at *2 (N.J. Sup. Ct. App. Div. Mar. 9, 2015) ("[W]e find no merit in appellant's contention that the inmate remedy form and his request for medical treatment were in themselves sufficient to give notice to the prison that he had a claim. Neither document provided the information that is required in a notice of tort claim[.]").

Finally, Plaintiff makes two unpersuasive arguments that his state law tort claims should not be dismissed because (a) failure to file a NJTCA notice of claim only bars claims for damages, not injunctive relief, and (b) his failure to file a notice of claim does not bar his § 1983 claims. A review of the Complaint reveals that Plaintiff seeks no injunctive relief related to his state law tort

claims—there is no request to enjoin Defendants from any ongoing torts or, for that matter, any allegations that the alleged torts are ongoing to begin with. As such, a damages bar would in fact prevent him from recovering any requested relief for his state law tort claims in the Complaint. Moreover, § 1983 does not encompass state law tort claims, so while the Court agrees that Plaintiff's failure to file a NJTCA notice of claim does not bar his § 1983 claims, Defendants are not seeking to dismiss his § 1983 claims on this defense. *See Moore v. Vangelo*, No. 03-4718, 2004 WL 292482, at *3 (E.D. Pa. Feb. 12, 2004) ("'Intentional Infliction Of Emotional Distress,' 'Assault And Battery,' 'Negligent Infliction Of Emotional Distress,' and 'Negligence,' do not encompass § 1983 violations, but instead are exclusively supplemental state law tort claims.") Accordingly, the Court finds that Plaintiff has failed to facially demonstrate, with regard to his state law tort claims, the basis of this Court's jurisdiction as required by Rule 8. Those claims, therefore, are dismissed without prejudice for failure to state a claim upon which relief may be granted.

### C.     Protective Custody Incident

For this incident, the Court construes the Complaint as raising a procedural due process claim based on the allegations that Plaintiff was not afforded a hearing to determine his IPC status until two years after having been placed in IPC, and a substantive due process claim based on the fact that he was not allowed to congregate with other prisoners while in IPC. Defendants argue that Plaintiff has failed to state a claim upon which relief may be granted on either claim. The Court agrees.

"A procedural due process claim is subject to a two-stage inquiry: (1) whether the plaintiff has a[n] . . . interest protected by procedural due process, and (2) what procedures constitute due process of law." *Fanti v. Weinstock*, 629 F. App'x 325, 330 (3d Cir. 2015); *Huertas v. Sec'y Pa.*

*Dep't of Corr.*, 553 F. App'x 64, 66 (3d Cir. 2013) ("Procedural due process rights are triggered by deprivation of a legally cognizable liberty interest."). In essence, to establish his procedural due process claim, Plaintiff must necessarily establish the validity of his substantive due process claim. Here, it is unclear from the Complaint what liberty interest Plaintiff argues is protected by the Constitution. To the extent Plaintiff argues that mere placement in IPC violated his liberty interest, "inmates have no constitutional right to be housed in a cell of their choosing." *Toussaint v. Good*, 276 F. App'x 122, 124 (3d Cir. 2008) (citing *Sheehan v. Beyer*, 51 F.3d 1170, 1174 (3d Cir. 1995)). "As long as the conditions or degree of confinement to which the prisoner is subjected is within the sentence imposed upon him and is not otherwise violative of the Constitution, the Due Process Clause does not in itself subject an inmate's treatment by prison authorities to judicial oversight." *Sheehan*, 51 F.3d at 1174 (quoting *Montanye v. Haymes*, 427 U.S. 236, 242 (1976)). Thus, a prisoner has no constitutional right to remain in any prison unit. *See id.* ("[The prisoner] had no constitutional right to remain in Unit 3–C instead of Unit 2–R."). In that regard, Plaintiff's due process claims cannot be based on only his placement in IPC, because he had no liberty interest in choosing where he was incarcerated.

To the extent Plaintiff argues that he has a liberty interest to not be in segregated or solitary confinement, which his IPC confinement was presumed to be, such argument was foreclosed by the Supreme Court in *Sandin v. Conner*, 515 U.S. 472 (1995). "Lawful incarceration brings about the necessary withdrawal or limitation of many privileges and rights, a retraction justified by the considerations underlying our penal system." *Id.* at 485 (quoting *Jones v. N.C. Prisoner's Labor Union, Inc.*, 433 U.S. 119, 125 (1977)). "[S]egregated confinement d[oes] not present the type of atypical, significant deprivation in which a State might conceivably create a liberty interest." *Id.* at 486. Administrative confinement, without more, does not deprive inmates of a constitutionally

cognizable liberty interest. *Griffin v. Vaughn*, 112 F.3d 703, 709 (3d Cir. 1997). Instead, in deciding whether "an inmate's placement in segregated housing triggers a legally cognizable interest[,] courts should consider: (1) the amount of time spent in segregation; and (2) whether the conditions of segregation were significantly more restrictive than those imposed on other inmates in segregation." *Allah v. Bartkowski*, 574 F. App'x 135, 139 (3d Cir. 2014).

The Court finds that the Complaint lacks sufficient factual allegations to establish that Plaintiff's IPC confinement violated any cognizable liberty interest. To begin, Plaintiff makes no allegation that his IPC confinement was more restrictive or more severe than that of other inmates in segregation. Indeed, Plaintiff alleges that, while in IPC, he was provided with meals, visits with friends and family (albeit only non-contact, window visits),[11] and recreational activities. (Compl. 16.) Rather, Plaintiff bases his claims solely on the allegation that he was not allowed to congregate with other inmates in a variety of activities. *See id.* That is, of course, the very definition of segregated or solitary confinement. As stated above, *Sandin* forecloses the argument that inmates have a liberty interest to be free from segregated confinement.

The only remaining question, then, is whether the sheer length of the segregation, allegedly two years, by itself violated Plaintiff's constitutional rights. The Court's research has revealed no case holding that two years of segregated confinement, without other allegations of significantly more restrictive conditions, violates a prisoner's constitutional rights. Instead, the Third Circuit has held that 930 days in disciplinary confinement, without allegations of atypical hardship, is not

---

[11] Plaintiff cites no authority for the proposition that prisoners have a constitutional right to contact visits with family members. Indeed, the Supreme Court has held that prisoners do not have such a right. *Ky. Dep't of Corr. v. Thompson*, 490 U.S. 454, 460 (1989) ("[I]t [cannot] seriously be contended . . . that an inmate's interest in unfettered visitation is guaranteed directly by the Due Process Clause."); *Block v. Rutherford*, 468 U.S. 576, 589 (1984) ("[T]he Constitution does not require that detainees be allowed contact visits when responsible, experienced administrators have determined, in their sound discretion, that such visits will jeopardize the security of the facility.").

enough to state a violation of a cognizable liberty interest. *Young v. Beard*, 227 F. App'x 138, 141 (3d Cir. 2007); *cf. Pressley v. Blaine*, 352 F. App'x 701, 706 (3d Cir. 2009) (finding that district court erred in relying on *Young* to dismiss an inmate's due process claim when it relied entirely on the length of confinement without making findings as to the conditions of confinement). Accordingly, the Court finds that Plaintiff has failed to state a claim upon which relief may be granted with regard to the Protective Custody Incident. The Motion is granted as to all claims arising out of that incident, and those claims are dismissed without prejudice.

### D.    Cellphone Rule

In the Court's Prior Order, the Court construed the claim against the Cellphone Rule as one in violation of Plaintiff's First Amendment rights. In his supplemental brief, Plaintiff further asserts that the Cellphone Rule also violates the Equal Protection Clause by treating racial minorities differently than whites. (Pl.'s Supp. Br. 29, ECF No. 43.) Defendants assert that the Cellphone Rule does not violate either the First Amendment or the Equal Protection Clause. (*See generally* Defs.' Supp. Br., ECF No. 44.)

The Court rejects Plaintiff's argument with regard to the Equal Protection claim. "Proof of racially discriminatory intent or purpose is required to show a violation of the Equal Protection Clause." *Doe ex. rel. Doe v. Lower Merion Sch. Dist.*, 665 F.3d 524, 543 (3d Cir. 2011) (quoting *Antonelli v. New Jersey*, 419 F.3d 267, 274 (3d Cir. 2005)).

> Intentional discrimination can be shown when: (1) a law or policy explicitly classifies citizens on the basis of race; (2) a facially neutral law or policy is applied differently on the basis of race; or (3) a facially neutral law or policy that is applied evenhandedly is motivated by discriminatory intent and has a racially discriminatory impact.

*Antonelli*, 419 F.3d at 274 (internal citations omitted).

Here, Plaintiff does not adequately allege intentional discrimination. Plaintiff's sole argument is that the Cellphone Rule has a racially disparate impact due to the alleged fact that New Jersey statistically and disproportionately incarcerates more racial minorities than whites. (Pl.'s Supp. Br. 29-30.)  Racially disparate impact alone is not proof of discriminatory intent. *Pennsylvania v. Flaherty*, 983 F.2d 1267, 1273 (3d Cir. 1993). Furthermore, Plaintiff's argument fails for the obvious reason that if the Court adopts Plaintiff's argument, then *every* restrictive regulation imposed on inmates in New Jersey prisons becomes an Equal Protection violation— based on Plaintiff's theory, *all* prison regulations disproportionately affect racial minorities in New Jersey. Plaintiff's argument amounts to a claim that the entire penal institution in New Jersey is itself racially discriminatory. Such an extraordinary claim requires much more than a statistical showing of potentially disparate impact. The Court, therefore, rejects this argument.

With regard to the First Amendment claim, as the Court stated in its Prior Order,

> "[M]odern cell phones . . . are now such a pervasive . . . part of daily life that the proverbial visitor from Mars might conclude they were an important feature of human anatomy." *Riley v. California*, 134 S. Ct. 2473, 2484 (2014). This calls into question whether the Cellphone Rule is still a "rational limitation in the face of legitimate security interests of the penal institution." *Perez v. Fed. Bureau of Prisons*, 229 F. App'x 55, 57 (3d Cir. 2007) (quoting *Strandberg v. City of Helena*, 791 F.2d 744, 747 (9th Cir. 1986)). For those inmates whose families do not have landlines, the rule is not simply a "restriction" or "limitation" on telephone usage; it essentially amounts to practically no telephone privilege at all.

(Prior Order 2.)  Two factors guided the Court's decision to reexamine the continued constitutionality of the Cellphone Rule: (1) the apparent lack of any such rule in any other state prison system or the federal prison system, (*id.* at 2-3), and (2) the prevalence of cellphone use, which for many households has resulted in the elimination of traditional landline-based telephone services—especially among poorer households that have shown an even greater tendency to

23

eliminate landlines due to obvious cost concerns (*id.* at 2 n.2). As such, under the Cellphone Rule, it would be increasingly difficult, if not outright impossible, for New Jersey state prisoners—overwhelmingly from poorer households—to have telephone communication with their families, friends, and in some cases, their attorneys.

In *Turner v. Safley*, the Supreme Court held that prison regulations implicating First Amendment rights must be "reasonably related to legitimate penological objectives," and cannot be "an exaggerated response to those concerns." 482 U.S. 78, 87-88 (1987). To determine the reasonableness of a prison regulation, *Turner* identified four factors for courts to consider: (1) there must be a valid, rational connection between the prison regulation and the legitimate governmental interest put forward to justify it; (2) whether there are alternative means of exercising the rights that remain open to prison inmates; (3) the impact accommodation of the asserted constitutional right will have on guards and other inmates, and on the allocation of prison resources generally; and (4) the absence of ready alternatives. *Id.* at 89-90.

In addressing the first *Turner* factor, Defendants proffer four justifications for the Cellphone Rule: (1) inmates have alternative forms of communication to communicate with outside family and friends, namely written correspondence through mail, visitations, e-mail messages, and calls to landlines; (2) allowing calls to cellphones would present a greater security risk because there is less billing information available for cellphone accounts, especially given the existence of prepaid cellphones, and because cellphones are not attached to a specific location; (3) calls to cellphones would allow coordination of criminal activities between inmates because of the prevalence of illegal cellphones in prisons; and (4) allowing calls to cellphones would create "the chilling prospect of an inmate calling an associate operating a cell phone who is in close proximity to the prison" since "the two could more easily coordinate the inmate's escape because

24

they would be able to communicate, in real time, about ongoing events and changing conditions in the prison." (Defs.' Supp. Br. 13, 15-16.)

Defendants' justifications are tenuous at best. The inherent problem with the Cellphone Rule is that while Defendants claim the rule was enacted for security reasons, those reasons are not apparent on the Cellphone Rule's face. Unless one presumes that calls to cellphones, by their very nature, are somehow fundamentally more dangerous than calls to landlines, the rule is already overbroad on its face. *See Thornburgh v. Abbott*, 490 U.S. 401, 411 (1989) ("[O]ur rejection of the regulation at issue . . . resulted . . . from our recognition that the regulated activity centrally at issue . . . did not, by its very nature, pose a serious threat to prison order and security." (citing *Procunier v. Martinez*, 416 U.S. 396, 414 (1974))). Although Defendants' proffered justifications may have some merit in extremely limited circumstances, they do not explain why the ban is necessary with respect to the overwhelming majority of potential calls to cellphones for legitimate reasons. These limited justifications may have been reasonable when cellphone usage served only a minor portion of the population, but that is no longer the reality today.

Each of Defendants' justifications is problematic. The first justification, the availability of alternative forms of communication, could easily be used to justify a ban on *all* phone calls— essentially, it is Defendants' position that prisoners have no constitutional right to make phone calls at all. The Court has found no case law to support this proposition—instead, the Third Circuit has suggested that telephonic communication is an important aspect of protecting a prisoner's right to communicate with people outside prison walls. *See Almahdi v. Ashcroft*, 310 F. App'x 519, 522 (3d Cir. 2009) (finding that prisoners have "the right to communicate with people outside prison walls, and 'a telephone provides a means to exercising this right'" (quoting *Valdez v. Rosenbaum*, 302 F.3d 1039, 1048 (9th Cir. 2002))). As to Defendants' contention that the availability of

landlines is a viable alternative, the Court recognizes that, in the past, other courts in this district have relied on that rationale to uphold the Cellphone Rule as constitutional. *See, e.g., Graf v. Lanigan*, No. 14-2613, 2016 WL 324946, at *2 (D.N.J. Jan. 27, 2016); *Love v. N.J. Dep't of Corr.*, No. 14-5629, 2015 WL 2226015, at *3 (D.N.J. May 12, 2015); *Stokes v. Lanigan*, No. 12-1478, 2012 WL 4662487, at *6 (D.N.J. Oct. 2, 2012). But as the Court stated above, this is the central issue at the core of Plaintiff's claim that the landline alternative is vastly becoming a non-alternative in today's society, especially for prisoners. Indeed, at some point the percentage of households with landlines will become so miniscule that Defendants' argument will become obsolete. The question is whether our society has already reached that threshold. At this time, the Court cannot find that Plaintiff has failed to state a claim simply because calls to landlines exist as an alternative.

Defendants' second justification, that cellphones are harder to track, is obviously true simply for the fact that cellphones are mobile. Defendants, however, do not explain why that alone warrants a blanket ban on all calls to cellphones. While telephone communication can be used to conduct criminal activities by prisoners, that is a problem for both calls to landlines and cellphones. It is the reason why prisons place restrictions on calls to landlines themselves, based on an inmate's criminal history, proclivity for infractions, and other concrete and legitimate reasons. (*See* Pl.'s Supp. Br. 20-21.) Indeed, as Defendants admit, New Jersey currently only allows inmates to "call up to ten friends or family members on landlines[.]" (Defs.' Supp. Br. 16.) Defendants offer no explanation why reasonable restrictions on usage, instead of a blanket cellphone ban, would not be effective for calls to cellphones.[12]

---

[12] Defendants further argue that "[s]hould an inmate be permitted to add cell phone numbers to his call list, he could quite easily identify one person or persons as being associated with a certain

Defendants' third justification is that cellphones allow real-time communication by inmates, which, Defendants argue, presents a problem for prisons "because cell phones are, unfortunately, a common contraband item in NJDOC facilities." (*Id.* at 13.)  In other words, Defendants' justification for having the Cellphone Rule is in part because of their own inability to enforce other rules.  Even if this is a common problem, there is one obvious flaw in Defendants' justification—if one cellphone can be smuggled into a prison, nothing prevents prisoners from smuggling two, or twenty, cellphones into prison.  Prisoners do not need to rely on the prison phone system to call each other; they can just do so using two smuggled cellphones.  Under Defendants' rationale, the Cellphone Rule provides a miniscule benefit on the off-chance that one particularly "inept" inmate who is unable to access a smuggled cellphone may want to use the prison phone system to communicate with another inmate who does have a smuggled cellphone. Defendants acknowledge that there are no real-life examples of this imagined security risk. (*Id.* at 14.)[13]  Instead, Defendants' justification amounts to an argument that their own lack of capacity to prevent illegal activities warrants the prohibition of an arguably constitutionally protected act.  The Court is not persuaded by Defendants' arguments.  Notably, the Bill of Rights was created to place the affirmative burden on the government to enact and enforce laws in ways that do not infringe

---

phone number when he is in fact communicating with someone else." (Defs' Supp. Br. 13.) This problem, however, is not unique to cellphones; landlines can also be misused in a similar fashion.

[13] Defendants provide one example involving a phone call to a landline, which was then forwarded to a cellphone, resulting in the assault of an individual outside of the prison.  Defendants, however, do not explain why this crime could not have been orchestrated had the call been placed to the landline in question to begin with—the call forwarding seems to be an irrelevant detail presented simply because it involved a cellphone.  Indeed, if the Cellphone Rule itself can be easily circumvented by those intending to commit a crime, the very people the Cellphone Rule was purportedly promulgated to stop, then it makes no sense for the rule to exist—the only real effect it has, then, is to punish inmates who wish to call cellphones for legitimate purposes.

upon the rights of any individual, let alone a class of people as is the case here. *See Williams v. Florida*, 399 U.S. 78, 111-12 (1970).

Defendants' fourth and final justification is that cellphones can be used to coordinate prison escapes. Any form of communication, however, may be used to coordinate prison escapes, and Defendants do not adequately explain why cellphone communications are especially susceptible to such abuse. *Cf. Thornburgh*, 490 U.S. at 412 (finding that dangerous communications, such as escape plans, plans relating to ongoing criminal activity, and threats of blackmail or extortion, can be communicated through mail, but are "more likely to fall within readily identifiable categories," and are therefore capable of detection by other less restrictive means). Defendants argue that cellphone communication allows an accomplice to communicate in real time with a prisoner from just outside of the prison, but the Court fails to see why this presents any real security risk—while the accomplice can be anywhere, the prisoner has to make his phone call at a centralized location, under the careful watch of prison guards. The prisoner is not wandering around the prison giving real-time updates on guard movement or other vital information that may be used to plan an escape; the prisoner is situated in a room that can be monitored, making escape unlikely. Indeed, Defendants again admit that they have no real life example of this purported security risk.

The Court has touched upon most of the other *Turner* test factors in its analysis above. One important aspect that has not been addressed, however, is Plaintiff's assertion, which Defendants do not dispute, that no other jurisdiction in the entire country has enacted a blanket ban on calls to cellphones by prisoners. In fact, Plaintiff asserts, and Defendants do not dispute, that county jails *within* this state do not have an absolute ban on calls to cellphones. (Pl.'s Supp. Br. 24.) While Defendants argue that there is no ready alternative to the Cellphone Rule, and the elimination of that rule would place an "astronomical" burden on the state, (Defs.' Supp. Br. 16), it is readily

apparent that federal penal institutions, the penal institutions of 49 other states, and the county penal institutions within the state have all found ready alternatives. *See Procunier*, 416 U.S. at 414 n.14 ("While not necessarily controlling, the policies followed at other well-run institutions would be relevant to a determination of the need for a particular type of restriction."). In sum, having applied the *Turner* test to Plaintiff's claim, the Court finds that Defendants do not meet their burden of demonstrating that no claim has been presented. Accordingly, the Court denies Defendants' Motion as to this claim.

### E.    Toilet Incident

Plaintiff asserts that the problem with "ping-pong toilets" at the NJSP created an unsanitary condition of confinement. Defendants argue that Plaintiff does not state a claim upon which relief may be granted, because the allegations do not show that any of the defendants had actual knowledge of the problem and was deliberately indifferent about it. The Court agrees with Defendants.

The Eighth Amendment to the United States Constitution prohibits a state from inflicting "cruel and unusual punishments" on those convicted of crimes. *Rhodes v. Chapman*, 452 U.S. 337 (1981). The Supreme Court has construed the Eighth Amendment as prohibiting "conditions" that involve the unnecessary and wanton infliction of pain or are grossly disproportionate to the severity of the crime warranting imprisonment. *Id.* at 347. The cruel and unusual punishment standard is not static, but is measured by "the evolving standards of decency that mark the progress of a maturing society." *Id.* at 346 (quoting *Trop v. Dulles*, 356 U.S. 86, 101 (1956)). To state a claim under the Eighth Amendment, an inmate must satisfy both objective and subjective elements. *Farmer v. Brennan*, 511 U.S. 825, 834 (1994).

The objective element questions whether the deprivation of a basic human need is sufficiently serious; the subjective component asks whether the officials acted with a sufficiently culpable state of mind. *Wilson v. Seiter*, 501 U.S. 294, 298 (1991). The objective component is contextual and responsive to "contemporary standards of decency." *Hudson v. McMillian*, 503 U.S. 1, 8 (1992). The subjective component follows from the principle that "'only the unnecessary and wanton infliction of pain implicates the Eighth Amendment.'" *See Farmer*, 511 U.S. at 834 (quoting *Wilson*, 501 U.S. at 297 (internal quotation marks, emphasis, and citations omitted)); *Rhodes*, 452 U.S. at 345. What is necessary to establish an unnecessary and wanton infliction of pain varies according to the nature of the alleged constitutional violation. *Hudson*, 503 U.S. at 5.

Here, the difficulty with Plaintiff's claim is that no actor took any affirmative action that resulted in the alleged constitutional violation. *See Ashcroft v. Iqbal*, 556 U.S. 662, 676 (2009). Instead, Plaintiff's claim is more properly construed as one of a failure to act. Defendants do not specifically assert that the unsanitary condition failed to meet the objective component of the Eighth Amendment claim, but instead argue that "Plaintiff does not plead any facts demonstrating that [] Defendants were aware of the alleged sanitary [sic] condition, much less that they disregarded it." (Defs.' Moving Br. 20.) Plaintiff, however, does plead sufficient facts to show that *someone* had actual knowledge of the problem—Plaintiff asserts that he filed numerous grievances regarding the unsanitary condition to no avail, so at the very least those tasked with reviewing and responding to Plaintiff's grievances knew about the problem and failed to act to correct it. (*See* Compl. 35.) Unfortunately, the Complaint contains no allegations regarding who Plaintiff addressed the grievances to or who responded to the grievances. As such, the Court agrees with Defendants that the Complaint fails to state a claim upon which relief may be granted, at least with regard to the named defendants. Here, the Complaint does not give fair notice to any named

defendant that his or her conduct violated Plaintiff's constitutional rights. Accordingly, the Court grants the Motion on this claim, and the claim is dismissed without prejudice. If at a later stage of the litigation Plaintiff discovers the proper defendants for this claim, he may file a timely motion to amend the Complaint to add those defendants.

F.   **Lack of Legal Assistance**

Plaintiff asserts that he was not given access to the prison law library, and that he was provided with incompetent paralegals. (Compl. 15.) The Court construes Plaintiff's assertions as raising a denial of access to the courts claim under the First Amendment. Defendants argue that Plaintiff fails to state a claim upon which relief may be granted. The Court agrees.

Inmates have a right of access to the courts. *See Schreane v. Holt*, 482 F. App'x 674, 676 (3d Cir. 2012) (citing *Lewis v. Casey*, 518 U.S. 343 (1996)). "[T]he fundamental constitutional right of access to the courts requires prison authorities to assist inmates in the preparation and filing of meaningful legal papers by providing prisoners with adequate law libraries or adequate assistance from persons trained in the law." *Bounds v. Smith*, 430 U.S. 817, 828 (1977). Inmates, however, have "a right of access to the courts, not to a law library or to legal assistance." *Mitchell v. Wydra*, 377 F. App'x 143, 144 (3d Cir. 2010). In order to establish that Defendants violated Plaintiff's right to access, Plaintiff must demonstrate that: "(1) he suffered an 'actual injury' (*i.e.*, that he lost an opportunity to pursue a nonfrivolous claim); and (2) he has no other remedy . . . that can possibly compensate for the lost claim." *Schreane*, 482 F. App'x at 676 (citing *Monroe v. Beard*, 536 F.3d 198, 205 (3d Cir. 2008)).

Here, Plaintiff raises numerous allegations regarding his lack of access to the law library while in IPC, the provision of allegedly incompetent paralegals to assist him, and that his legal papers and mail were impermissibly confiscated. Plaintiff, however, does not allege that any of

31

these alleged acts caused him to lose a meritorious legal claim.  While many of the alleged acts may have increased Plaintiff's burden in pursuing his legal claims, without allegations that he actually lost a legal claim they do not rise to the level of a constitutional violation.  Therefore, the Court finds that Plaintiff fails to state a claim upon which relief may be granted.  The Court grants the Motion on this ground and dismisses the claim without prejudice.

###### G.    Fabricated Disciplinary Proceedings and Detention Incident

For these incidents, the Court construes the Complaint as raising four claims:  (1) violation of procedural due process for the disciplinary proceedings, (2) deprivation of personal property, (3) retaliation, and (4) unconstitutional conditions of confinement while in IPC as a consequence of these disciplinary charges.  Defendants argue that Plaintiff fails to state a claim.

###### 1.    Procedural due process

As stated above, to establish his procedural due process claim, Plaintiff must necessarily establish a substantive due process right that had been violated.  *See supra* Sec. III-C.  Plaintiff alleges that the disciplinary proceedings and detention resulted in: (a) his placement in the IPC, (b) the loss of his prison job, (c) the loss of access to an incentive food package program at the prison, and (d) the deprivation of the use of certain personal belongings when he was forced to send them home.  None of these actions, however, violated Plaintiff's constitutional rights, and therefore cannot sustain a procedural due process violation.

As the Court held above, administrative segregation, alone, does not violate the Constitution.  Furthermore, prisoners do not have a constitutional right to prison jobs.  *See Williams v. Fed. Bureau of Prisons & Parole Comm'n*, 85 F. App'x 299, 305 (3d Cir. 2004) ("[I]nmates have no right to a particular job assignment while they are incarcerated[.]" (citing *James v. Quinlan*, 866 F.2d 627, 630 (3d Cir. 1989))); *Little v. Terhune*, 200 F. Supp. 2d 445, 451

(D.N.J. 2002) ("[I]nmates do not have a constitutional right to educational and work programs.").

Moreover, "[t]he Constitution . . . 'does not mandate comfortable prisons,' and only those

deprivations denying 'the minimal civilized measure of life's necessities,' are sufficiently grave to

form the basis" of a constitutional violation. *Wilson*, 501 U.S. at 298 (quoting *Rhodes*, 452 U.S.

at 347, 349). No argument can be made that an incentive food package program qualifies as a

"minimal civilized measure of life's necessities," and Plaintiff does not allege that any of the

personal belongings he was deprived of fall within that definition. Thus, the Court dismisses

Plaintiff's procedural due process claims with regard to these incidents without prejudice, and the

Motion is granted on these claims.

2.    Personal property

While Plaintiff alleges that certain items of personal property were confiscated from him

due to these incidents, "[i]ntentional and negligent deprivations of property do not violate due

process if meaningful post-deprivation remedies for the loss are available." *Pressley v. Huber*,

562 F. App'x 67, 69-70 (3d Cir. 2014). The Third Circuit has held that such meaningful post-

deprivation remedies exist in New Jersey. *Revell v. Port Auth. of N.Y., N.J.*, 598 F.3d 128, 139

(3d Cir. 2010) ("[A petitioner] cannot prevail on his due process claim if the state's post-

deprivation procedures, including state tort remedies, are adequate. [The petitioner] has failed to

explain why New Jersey's state procedures to recover wrongfully seized property, such as the

ability to move in the criminal action for return of his property or the ability to file a separate action

for a writ of replevin, are insufficient."). Here, even accepting Plaintiff's allegations as true, there

was no due process violation because Plaintiff had an independent and adequate post-deprivation

remedy available to him under state law. To the extent that Plaintiff is raising such a state law tort

claim in the Complaint, however, that claim would fail due to his failure to file a notice of claim

as described above.  As such, the Motion is granted on this claim, and the claim is dismissed without prejudice.

        3.    <u>Retaliation</u>

    Plaintiff asserts that the disciplinary proceedings and the resulting detention were in retaliation for his filing of grievances.  To state a claim for retaliation in violation of the First Amendment, a plaintiff must establish: "(1) constitutionally protected conduct, (2) retaliatory action sufficient to deter a person of ordinary firmness from exercising his constitutional rights, and (3) a causal link between the constitutionally protected conduct and the retaliatory action." *Considine v. Jagodinski*, 646 F. App'x 283, 286 (3d Cir. 2016) (quoting *Thomas v. Independence Twp.*, 468 F.3d 285, 296 (3d Cir. 2006)).  "As a threshold matter, a prisoner-plaintiff in a retaliation case must prove that the conduct which led to the alleged retaliation was constitutionally protected." *Rauser v. Horn*, 241 F.3d 330, 333 (3d Cir. 2001).  To establish a causal link:

> the plaintiff [bears] the initial burden of proving that his constitutionally protected conduct was 'a substantial or motivating factor' in the decision to discipline him.  The burden then shift[s] to the defendant to prove by a preponderance of the evidence that it would have taken the same disciplinary action even in the absence of the protected activity.

*Id.* (citing *Mount Healthy Bd. of Educ. v. Doyle*, 429 U.S. 274, 287 (1977)).

    In *Watson v. Rozum*, 834 F.3d 417 (3d Cir. 2016), the Third Circuit clarified this standard. *Watson* held that "a plaintiff can make out a retaliation claim even though the charge against him may have been factually supported." *Id.* at 426.  Courts must evaluate "'the quantum of evidence' of the misconduct to determine whether the prison officials' decision to discipline an inmate for his violations of prison policy was within the broad discretion we must afford them." *Id.*  In *Watson*, the court held that an inmate who was disciplined for having a broken radio, which was considered contraband, could sustain a retaliation claim because "[the] broken radio was not so

34

'clear and overt' a violation that [the court could] conclude that he would have been written up if he had not also given prison officials 'a hard time.'" *Id.* "Moreover, [the court determined that] there [was] evidence that other inmates had radios with loose or broken antennas, but those items were not confiscated and the inmates did not receive a misconduct [charge]." *Id.*

Here, there is no dispute that Plaintiff had a right to file grievances, and that any retaliation for the exercise of that right was prohibited. *Harris v. Terhune*, 45 F. App'x 95, 97 (3d Cir. 2002) ("The government may not retaliate against an individual for exercising his constitutionally protected right to file grievances."). As to whether there was a causal link between the alleged disciplinary action and the filing of the grievances with regard to the Detention Incident, Plaintiff alleges that he was disciplined after Officer Forbes committed official misconduct by bringing contraband into Plaintiff's cell, which resulted in the alleged false charge. (Compl. 30.) Plaintiff, however, does not identify the contraband or the false charge. Therefore, it is impossible for the Court to plausibly infer that the charge was false, and that the charge was a retaliatory action. *See Ashcroft*, 556 U.S. at 678 (holding that courts are free to ignore factually unsupported accusations that merely state "the-defendant-unlawfully-harmed-me").

Conversely, as to the causal link regarding the Fabricated Disciplinary Proceedings, similar to *Watson*, the Court cannot say that the Document, a map/diagram of a courtroom, was "clear and overt" contraband, especially given the allegations that Plaintiff was expressly permitted to keep it prior to the disciplinary charge. Thus, at this stage of the litigation, it is plausible that Plaintiff may have avoided discipline if not for the numerous grievances and lawsuits against prison officials; indeed, Plaintiff alleges that the Document itself was to be used in one of the lawsuits. Consequently, the Court grants the Motion and dismisses the retaliation claim relating to the

Detention Incident without prejudice, but denies the Motion on the retaliation claim relating to the Fabricated Disciplinary Proceedings.

4.     Conditions of confinement

Lastly, as summarized above, Plaintiff alleges that for four days, he was "forced to live and sleep within [his] cell without any blankets and only one sheet, that was given to him by another inmate, on a bare mattress, despite his requests for bedding materials." (Compl. 34.)  Plaintiff further alleges that he was held for "approximately 55 calendar days straight" in violation of New Jersey law and "common standards." (*Id.*)  Plaintiff also alleges that he was deprived of all of his personal property while in detention, "including legal materials, reading and writing materials, basic hyg[i]enic supplies, and clothing," and as a result, Plaintiff was "hindered" in his ongoing legal proceedings. (*Id.* at 31.)  Plaintiff additionally alleges that he was denied recreation, "regular" use of the phone, and "regular" visits. (*Id.*)  To the extent that the Complaint can be construed as raising a denial of access to the courts claim and a deprivation of personal property claim, the Court dismisses those claims for the reasons set forth *supra*.

With respect to the claim of unconstitutional conditions of confinement, as stated above, the alleged 55 days of administrative segregation is not sufficiently long to sustain a violation.  The allegations that Plaintiff did not have a blanket and only had one sheet for four days are also not sufficient to sustain a violation. *Cf. Fortune v. Hamberger*, 379 F. App'x 116, 122 (3d Cir. 2010) (finding that a plaintiff who was without showers for 15 days was not denied the "minimal civilized measure of life's necessities," nor did he allege that he suffered any harm as the result of the denial).  With regard to the alleged deprivation of the "regular" use of the phone and visits, Plaintiff does not explain what "regular" amounts to; indeed, even a minimal provision of the use of phone and minimal visits may satisfy constitutional requirements for a period of only 55 days. *Id.*

Finally, courts have held that 55 days without recreation is not an Eighth Amendment violation. *Pearson v. Ramos*, 237 F.3d 881, 884 (7th Cir. 2001) (denial of out-of-cell exercise opportunities for less than 90 days not unconstitutional); *Beverati v. Smith*, 120 F.3d 500, 504 (4th Cir. 1997) (six months of no outside recreation, among other things, was not a significant hardship in relation to the ordinary incidents of prison life); *Thompson v. Stovall*, No. 10-4113, 2013 WL 501437, at *6 (W.D. Ark. Jan. 18, 2013) (two or three months without outside recreation, unaccompanied by allegations of any resulting physical harm, was not sufficient to demonstrate deliberate indifference); *Pounds v. Newhart*, No. 12-0256, 2012 WL 859555, at *3 (E.D. Va. Mar. 13, 2012) (three months); *Gruenberg v. Schneiter*, No. 10-0749, 2011 WL 4729785, at *5 (E.D. Wis. Oct. 5, 2011) (90 days, citing *Pearson*, 237 F.3d at 884).  Accordingly, the Court grants the Motion on this claim, and dismisses the claim without prejudice.

### H.   OPRA Requests

Finally, the Court addresses Plaintiff's OPRA claim.  Defendants contend that the Court lacks jurisdiction to adjudicate the denial of Plaintiff's OPRA requests in federal court, as the statute only allows Plaintiff to appeal such a denial to the New Jersey Superior Court.  (Defs.' Moving Br. 31.)  "[A] state statute cannot be applied so as to limit a federal court's supplemental jurisdiction."  *Hindes v. FDIC*, 137 F.3d 148, 168 n.15 (3d Cir. 1998).  The statute in question, N.J.S.A. § 47:1A-6, states that "a person who is denied access to a government record by the custodian of the record, at the option of the requestor, may institute a proceeding to challenge the custodian's decision by filing an action in Superior Court."  As such, if Plaintiff can file an action in state court, the Court has jurisdiction by virtue of its supplemental jurisdiction granted by Congress, as long as Plaintiff's OPRA claim is so related to his federal claims as to form part of the same case or controversy.  *See* 28 U.S.C. § 1367(a) ("[T]he district courts shall have

supplemental jurisdiction over *all other claims* that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution.") (emphasis added).

Supplemental jurisdiction, however, "is a doctrine of discretion, not of plaintiff's right." *Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 350 (1988). The district court may decline to exercise supplemental jurisdiction over a state-law claim if: (1) the claim raises a novel or complex issue of State law, (2) the claim substantially predominates over the claim or claims over which the district court has original jurisdiction, (3) the district court has dismissed all claims over which it has original jurisdiction, or (4) in exceptional circumstances, there are other compelling reasons for declining jurisdiction. 28 U.S.C. § 1367(c). Courts in this circuit have declined supplemental jurisdiction over a state-law claim against a particular defendant when there were no federal claims remaining in the suit over that defendant, even when the court had federal question jurisdiction over claims against other defendants. *Drury v. Debellis*, No. 15-2137, 2015 WL 4525165, at *2 (D.N.J. July 27, 2015); *Nadal v. Christie*, No. 13-5447, 2014 WL 2812164, at *8 (D.N.J. June 23, 2014); *T.R. v. Cty. of Del.*, No. 13-2931, 2013 WL 6210477, at *8 (E.D. Pa. Nov. 26, 2013); *Culver v. Specter*, No. 11-2205, 2013 WL 5488649 (M.D. Pa. Sept. 30, 2013).

Here, Plaintiff's OPRA claim is against one defendant, Falvey, the record custodian of the NJDOC; indeed, the state statute referenced above only allows suit against the record custodian. Falvey, however, was not in any way involved in any of the other claims raised by Plaintiff—the only connection between Plaintiff's OPRA claim and his other claims is that Plaintiff's OPRA requests sought documents related to his disciplinary proceedings. Even if the Court fully adjudicated all other claims in this lawsuit, it would be no closer to a resolution of the OPRA claim than it is today—Plaintiff's OPRA claim involves whether Falvey impermissibly denied Plaintiff's

requests, and has no relation to the contents of the records sought. As such, it does not appear that the Court has supplemental jurisdiction over the OPRA claim because it is not sufficiently related to Plaintiff's other claims.

Assuming, arguendo, that the Court does have supplemental jurisdiction over this claim, the Court nevertheless declines supplemental jurisdiction. The Court does not entirely agree with its aforementioned sister courts that the lack of federal claims over a pendent party automatically justifies the decline of supplemental jurisdiction. *Cf. Exxon Mobil Corp. v. Allapattah Servs., Inc.*, 545 U.S. 546, 558-59 (2005) ("The last sentence of § 1367(a) makes it clear that the grant of supplemental jurisdiction extends to claims involving joinder or intervention of additional parties. . . . § 1367(a) is a broad jurisdictional grant, with no distinction drawn between pendent-claim and pendent-party cases."). The reasoning implicit in their decisions, however, is not lost on the Court: a plaintiff should not be allowed to drag into federal court an otherwise unrelated defendant through the assertion of a state-law claim that only has some tangential relationship to plaintiff's federal claims against other parties. Indeed, for diversity jurisdiction cases, Congress expressly forbids the exercise of supplemental jurisdiction over such pendent parties. *See* 28 U.S.C. § 1367(b) ("In any civil action of which the district courts have original jurisdiction founded solely on [diversity], the district courts shall not have supplemental jurisdiction . . . over claims by plaintiffs against persons made parties under Rule 14, 19, 20, or 24[.]").

As stated above, Plaintiff's only claim against Falvey is his OPRA claim, which is neither indispensable to Plaintiff's other claims nor intertwined in such a way as to be inseparable. Moreover, no judicial economy would be realized if the OPRA claim was tried together with the other claims—not only are the laws entirely different, the essential facts are unrelated between the claims. On the other hand, Falvey may be prejudiced by the Court's exercise of supplemental

jurisdiction, because he "would be subject to a suit involving numerous issues with which [he has] no connection[, and] . . . could be significantly prejudiced by any determination of impropriety on the part of the [other] defendants." *Grodjeski v. Plainsboro Twp.*, 577 F. Supp. 67, 72 (D.N.J. 1983). On balance, the Court finds that there are compelling reasons to decline supplemental jurisdiction. Accordingly, the Motion is granted, and Plaintiff's OPRA claim is dismissed without prejudice.

## V.   <u>CONCLUSION</u>

For the reasons set forth above, the Court **DENIES** the Motion with respect to Plaintiff's claim against the Cellphone Rule and his retaliation claim arising out of the Fabricated Disciplinary Proceedings, and **GRANTS** the Motion on all other claims. Plaintiff's claims arising out of the Assault Incidents are **DISMISSED** with prejudice, and all other dismissals are without prejudice.


<u>     s/ Michael A. Shipp     </u>
**MICHAEL A. SHIPP**
**UNITED STATES DISTRICT JUDGE**


<u>Dated:</u>  March 20, 2017